UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LARRY WAYNE WOODWARD, SR.,

       Petitioner,

v.                          Case No: 3:13-cv-155-J-34JRK

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS
and ATTORNEY GENERAL, STATE
OF FLORIDA,

       Respondents.

_____

**ORDER**

**I.    Status**

Petitioner Larry Wayne Woodward ("Woodward" or "Petitioner"), an inmate of the Florida penal system, initiated this action by filing a *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1, filed February 13, 2012).  His amended petition is presently before the Court (Petition; Doc. 7, filed March 22, 2013).  In the Petition, Woodward challenges convictions from the Fourth Judicial Circuit, in and for Duval County Florida, for three counts of sexual battery on a person less than twelve years of age and one count of lewd and lascivious touching on a person less than sixteen years of age. Id. at 2.  Respondents submitted a memorandum and exhibits in opposition to the Petition (Response; Doc. 15; Doc. 18).  On April 8, 2013, the Court entered an Order to Show Cause and Notice to Petitioner (Doc. 10), admonishing

Woodward regarding his obligations and giving him a time frame in which to submit a reply.   Woodward submitted a brief in reply (Reply; Doc. 19). This case is ripe for review.

## II.  Procedural History

On January 22, 2004, the State of Florida charged Woodward by third amended information with three counts of capital sexual battery, in violation of Florida Statute § 794.011(2)(a), and one count of lewd, lascivious, or indecent touching, in violation of Florida Statute § 800.04(1) (Ex. G).[1]

At the conclusion of a four-day jury trial that began on January 26, 2004, the jury returned a guilty verdict on all counts (Ex. O; Ex. P). Following the conviction, the trial court sentenced Woodward to life in prison on each of the sexual battery convictions and to three and a half years in prison on the lewd and lascivious touching conviction (Ex. S).   Florida's First District Court of Appeal affirmed Woodward's convictions and sentences per curiam (Ex. Y); Woodward v. State, 902 So. 2d 799 (Fla. 1st DCA 2005).

On January 31, 2006, Woodward filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure ("Rule 3.850 motion") in which he raised twenty-

---

[1] Unless otherwise indicated, citations to exhibits are to those filed by Respondents on January 2, 2014 (Doc. 18).   Citations to the trial transcript, located in Respondents' Exhibit O, is cited as (T. at ___).

four claims of ineffective assistance of counsel (Ex. EE). The state post-conviction court conducted an evidentiary hearing on December 14, 2006 (Ex. II).  Although Woodward requested counsel at the hearing, the court denied his request. <u>Id.</u> at 5.  After the hearing, the post-conviction court denied all of Woodward's claims (Ex. JJ).

Florida's First District Court of Appeal reversed the state post-conviction court's decision in part and remanded the case, finding that Petitioner was entitled to post-conviction counsel at the evidentiary hearing on his claims that trial counsel was ineffective for failing to pursue an insanity defense and for failing to challenge the voluntary nature of his confession (Ex. QQ); <u>Woodward v. State</u>, 992 So. 2d 391 (Fla. 1st DCA 2008).  The appellate court affirmed the denial of the remainder of Woodward's claims, concluding that they "either were not so complex as to require counsel's assistance or did not state a prima facie case for collateral relief[.]" <u>Woodward</u>, 992 So. 2d at 394.

On remand, the state post-conviction court appointed counsel to represent Woodward, and conducted two additional hearings (Ex. RR; Ex. TT). Following the proceedings, the parties submitted written memoranda (Ex. TT).  Thereafter, the trial court entered an order denying Woodward's request for post-conviction relief (Ex. UU).  Florida's First District Court of Appeal affirmed *per*

*curiam* without a written opinion (Ex. AAA); Woodward v. State, 84 So. 3d 315 (Fla. 2012).

### III. One-Year Limitations Period

The Petition appears to be timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d); (Doc. 12 at 6-7).

### IV.   Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.

The pertinent facts of this case are fully developed in the record before the Court.  Upon consideration of the pleadings and the state court record, each of Woodward's fifteen claims is either due to be dismissed or denied.  Because this Court can "adequately assess [Woodward's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V.    Standard of Review

The Court will analyze Woodward's claims under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Thus, 28 U.S.C. § 2254(d) "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 562 U.S. 86, 98 (2011). As the United States Supreme Court stated, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). This standard of review is described as follows:

> Under AEDPA, when the state court has adjudicated the petitioner's claim on the merits, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Williams, 529 U.S. at 413, 120 S. Ct. 1495).

For § 2254(d), clearly established federal law includes only the holdings of the Supreme Court – not Supreme Court dicta, nor the opinions of [a circuit court]. White v. Woodall,– U.S. –, 134 S. Ct. 1697, 1702, 188 L.Ed.2d 698 (2014). To clear the § 2254(d) hurdle, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 131 S. Ct.770, 786-87, 178 L.Ed.2d 624 (2011). "[A]n 'unreasonable application of' [Supreme Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003)). A state court need not cite or even be aware of Supreme Court cases "so long as neither the reasoning nor the result of the

state-court decision contradicts them." Early
v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154
L. Ed. 2d 263 (2002); accord Richter, 131 S.
Ct. at 784.

"AEDPA thus imposes a highly deferential
standard for evaluating state-court rulings
and demands that state-court decisions be
given the benefit of the doubt." Renico v.
Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 176
L.Ed.2d 678 (2010) (citations and internal
quotation marks omitted). And when a claim
implicates both AEDPA and Strickland, our
review is doubly deferential. Richter, 131 S.
Ct. at 788 ("The standards created by
Strickland and § 2254(d) are both highly
deferential, and when the two apply in tandem,
review is doubly so." (citations and internal
quotation marks omitted)). [A petitioner] must
establish that no fairminded jurist would have
reached the Florida court's conclusion. See
Richter, 131 S. Ct. at 786-87; Holsey v.
Warden, Ga. Diagnostic Prison, 694 F.3d 1230,
1257-58 (11th Cir. 2012). "If this standard is
difficult to meet, that is because it was
meant to be." Richter, 131 S. Ct. at 786....

Taylor v. Sec'y, Fla. Dep't of Corr., 760 F.3d 1284, 1293-94 (11th

Cir. 2014); see also Hittson v. GDCP Warden, 759 F.3d 1210, 1230

(11th Cir. 2014).

Finally, for a state court's resolution of a claim to be an

adjudication on the merits, so that the state court's determination

will be entitled to deference for purposes of federal habeas corpus

review under AEDPA, all that is required is a rejection of the

claim on the merits, not an opinion that explains the state court's

rationale for such a ruling. Hittson, 759 F.3d at 1232 ("[T]here

is no AEDPA requirement that a state court explain its reasons for

rejecting a claim[.]"); Richter, 562 U.S. at 100 (holding that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits); Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002). Thus, to the extent Woodward's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

## VI.   Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003) and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104.

Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010)(citation omitted). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, - U.S. at -, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under

> the Strickland standard was incorrect but
> whether that determination was unreasonable –
> a substantially higher threshold." Knowles v.
> Mirzayance, 556 U.S. 111, 123, 129 S. Ct.
> 1411, 1420, 173 L. Ed. 2d 251 (2009)
> (quotation marks omitted). If there is "any
> reasonable argument that counsel satisfied
> Strickland's deferential standard," then a
> federal court may not disturb a state-court
> decision denying the claim. Richter, - U.S. at
> -, 131 S. Ct. at 788.

Hittson, 759 F.3d at 1248; Knowles v. Mirzayance, 556 U.S. 111,

123 (2009); see also Rutherford v. Crosby, 385 F.3d 1300, 1309

(11th Cir. 2004) ("In addition to the deference to counsel's

performance mandated by Strickland, the AEDPA adds another layer

of deference--this one to a state court's decision--when we are

considering whether to grant federal habeas relief from a state

court's decision.").

## VII. Exhaustion and Procedural Default

The AEDPA precludes federal courts, absent exceptional

circumstances, from granting habeas relief unless a petitioner has

exhausted all means of available relief under state law.

Exhaustion of state remedies requires that the state prisoner

"fairly presen[t] federal claims to the state courts in order to

give the State the opportunity to pass upon and correct alleged

violations of its prisoners' federal rights[.]" Duncan v. Henry,

513 U.S. 364, 365 (1995) (citing Picard v. Connor, 404 U.S. 270,

275-76 (1971)).  The petitioner must apprise the state court of

the federal constitutional issue, not just the underlying facts of

the claim or a similar state law claim.   Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998).

In addition, a federal habeas court is precluded from considering claims that are not exhausted and would clearly be barred if returned to state court. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (if a petitioner has failed to exhaust state remedies and the state court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

Finally, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. Coleman, 501 U.S. at 750.   If a petitioner attempts to raise a claim in a manner not permitted by state procedural rules, he is barred from pursuing the same claim in federal court. Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

A petitioner can avoid the application of procedural default by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation. Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179–80 (11th Cir. 2010). To show cause, a petitioner

"must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999); Murray v. Carrier, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate there is a reasonable probability the outcome of the proceeding would have been different. Crawford v. Head, 311 F.3d 1288, 1327–28 (11th Cir. 2002).

A second exception, known as the fundamental miscarriage of justice, only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"  Murray, 477 U.S. at 479-80. Actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998).  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995).  "To be credible, a claim of actual innocence must be based on [new] reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324).

## VIII. Findings of Fact and Conclusions of Law

### A.   CLAIM ONE

Woodward asserts that the trial court erred when it denied his motion to suppress the statements and written confession he

made to the police (Petition at 21).[2] Specifically, he claims that:
(1) the interviewing detective implied that a confession would
result in leniency; (2) the detective directed him to produce a
written confession; (3) the detective refused to permit him to use
the bathroom until he produced a written confession; (4) the
detective undermined the Miranda warnings by telling him that he
would be appointed a "fly by night" public defender; (5) the
detective implied that he would not get a fair trial because of
the inadequacy of the public defender; (6) he was in poor health;
and (7) the detective used interrogation techniques tending to
elicit false confessions. Id. at 21-22.

Woodward raised Claim One in a motion to suppress before the
state trial court, and the court held an evidentiary hearing during
which the interviewing detective (Detective Gupton) testified

---

[2] The written confession at issue read:

> I, Larry W. Woodward, Sr. hereby acknowledge
> that I am guilty as best I can remember of the
> said allegations by (T.W. and H.B.).  I am
> extremely sorry and remorseful of the hurt and
> mistrust I caused them and would like to
> convey that they told the truth.  I would also
> like to find some help for them and myself [so
> that] something like this never happens again.
> It would also help to acknowledge that they
> were victims of substance abuse as were [sic]
> I myself.  I hope and I pray for them to start
> healing right away with this acknowledgment.

(Ex. T at 19).

about his interview techniques (Ex. D; Ex. K).  The court held another hearing on November 14, 2003, during which the trial court heard testimony from a psychologist, Dr. Meissner, about the likelihood of false confessions under certain interview conditions (Ex. M).  The trial court also listened to a recording of Detective Gupton's interview with Woodward.[3]  At a January 4, 2004 hearing, the trial court orally denied the motion to suppress:

> As to the motion to suppress, I listened to all the testimony, I actually listened to all of the CD recording of the interview with Mr. Woodward, and I think I pointed out to counsel on the record already that the CD recording that I was provided is in some manner, although probably not significant, but it is different in some respects from the transcripts that I was provided, so my conclusion is based primarily on what I actually read.
>
> I also had benefit of depositions that I read with all for this.  And I also considered the testimony of Dr. . . . Meissner, the expert on the – what you call it – psychologist.  In any event, his expertise is in the record.
>
> Having done all that and having listened to all of the interview, including Mr. Woodward's voice patterns and what he had to say and the entire context of the thing, I cannot conclude as a matter of law that the confession was involuntarily entered, and accordingly, the motion to suppress is denied.

---

[3] A redacted transcript of Woodward's interview with Detective Gupton is attached to the transcript of Woodward's November 6, 2003 suppression hearing.  See Doc. 18-1 at 84; Doc. 18-2.  Unless otherwise indicated, citations to this interview transcript will be cited as (Int. at ___).

(Ex. N at 4-5).  Florida's First District Court of Appeal affirmed *per curiam* without a written opinion (Ex. Y).

Woodward now asserts that "[u]nder the unusual set of coercive circumstances" to which he was subjected, his confession was involuntary (Petition at 21-22).  The Court disagrees. Given the record in the instant action, Woodward is not entitled to relief because the state court's adjudication of this claim is entitled to deference under the AEDPA. See Land v. Allen, 573 F.3d 1211, 1217 (11th Cir. 2009) ("We agree that we must independently ascertain and apply Federal law to determine whether the challenged statement was obtained in accordance with the Constitution. However, we do so as a first step in order to ultimately determine whether the state court's finding that Land's statement was voluntary was contrary to, or an unreasonable application of, that law.").

The law regarding the voluntariness of a confession is well settled.  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Colorado v. Connelly, 479 U.S. 157, 170 (1986) (citation omitted).  A court's assessment of voluntariness must be based on an examination of the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); Frazier v. Cupp, 394 U.S. 731, 739 (1969) (examining "totality of the

circumstances" to assess the admissibility of a confession).   A
conclusion that a confession was involuntary requires a finding of
official overreaching or coercion causally related to the
confession. Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988).
Thus, for example, sufficiently coercive conduct has been found
where: the accused was subjected to an exhaustingly long
interrogation; the interrogator threatened or used physical force;
or the interrogator made a promise that induced a confession. See
Connelly, 479 U.S. at 163 n. 1; Miller, 838 F.2d at 1536.

After a thorough review of the record and the applicable law,
the Court concludes that the state court's adjudication of this
claim was not contrary to Connelly or any other clearly established
law as set forth by the Supreme Court of the United States and did
not involve an unreasonable application of clearly established
law. Nor was the state court's adjudication based on an
unreasonable determination of the facts in light of the evidence
presented in the state court proceedings.   Accordingly, under the
AEDPA's deferential standard, Woodward is not entitled to relief
on the basis of this claim.

### 1.   Woodward's medical and physical conditions

The Court first turns to Woodward's claims that he was "highly
medicated" and running a 102 degree temperature during the
interrogation and that the detective refused his request to use
the bathroom until he confessed (Petition at 21). Upon review of

the record, the Court determines that these contentions are not supported by the transcript of the interview.

At the beginning of the interview, Detective Gupton asked Woodward whether he suffered from "any condition that you know of or are aware of that would prevent you from speaking to me or understanding what I'm asking you?" (Int. at 4). Woodward answered "no." Id. When asked whether he took medication, Woodward told Detective Gupton that he was currently using nitroglycerin and the pain-reliever Lortab. Id.[4] During the course of the interview, Detective Gupton asked Woodward whether he needed anything and asked whether he had his medication with him. Woodward asked only for water. Id. at 36. The transcript does not indicate that Woodward showed signs of confusion or expressed discomfort to Detective Gupton. At trial, Detective Gupton testified that he was aware of Woodward's recent heart surgery, but stated that Woodward gave no indication he could not continue to speak with the police (T. at 509-10, 512). Detective Gupton further testified that Woodward exhibited only slight signs of discomfort from his recent surgery and walked to the jail without assistance after the interview (T. at 536, 541).

---

[4] Woodward testified differently at trial, stating that he had also taken blood pressure medication, a muscle relaxant, and an anti-anxiety drug on the day of the interview (T. at 576-77).

With regard to Woodward's assertion that Detective Gupton refused to allow him to use the bathroom unless he confessed, this contention is refuted by the record.  Woodward had already decided to write the confession when he first asked to go to the bathroom (Int. at 77).  After finishing the statement, Woodward did not rush to the bathroom or even immediately repeat his request; rather he continued to ask Detective Gupton questions as to what would happen next and whether his medication would be available in prison. Id. at 77-79. It was only after Detective Gupton asked Woodward whether he wanted something to eat that Woodward repeated his request to use the bathroom. Id. at 79.

In light of the record, Woodward has failed to show that his state of health, use of medication, and need to use the restroom rendered his confession involuntary.

### 2.   *Detective Gupton's suggestions of leniency*

Next the Court turns to Woodward's contention that, during the interview, Detective Gupton implied that the State Attorney might treat him more leniently if he confessed to the allegations of sexual abuse.  In this regard, Woodward points to the fact that Detective Gupton repeatedly suggested that Woodward may have committed the sexual batteries while intoxicated (Int. at 48, 49, 51, 56).  Detective Gupton explained his reasoning to Woodward during the interview:

No.  I've done enough reading, enough classes, enough practical cases of people that have sat right across from me, sat in your same seat right now.  Over a period of years, Larry over a lifetime, there is something that you can't control that would cause you – help you act out that way.  And I think alcohol's a conduit that would stoke the fire.  Okay?

And I could go to the State Attorney's Office and say, this is what happened to Larry to help cause this, to help cause his actions. Or I'm simply going to go to the State Attorney's Office and say, Larry says he was drunk and if he can't remember something, maybe – it maybe – whether it happened or not, he can't remember.

.  .  .

I don't want to see anybody get dragged through it.  It causes too much pain – too much pain to the kids.

.  .  .

What I'd rather do is go to the state and say this is the truth.  This is how these things occurred.  This is why Larry had to do what he did, from Larry's own words and try to find some solution to help make this situation – help find some light at the end of the tunnel, Larry.  Because right now there ain't no light.  I'm searching for some sort of light. Okay?  Right now there's a big black hole.

But with your help, I can give a little bit of light at the end of that tunnel.  And there will be – and there will be a light at the end of the tunnel.  But I can only do that with you.

.  .  .

You know, but you've got to ask yourself, Larry, do you want to see that light or do you want it to be a continual black hole?

Id. at 57-60.  Detective Gupton told Woodward that he could tell the State Attorney that Woodward wanted to make amends and to speak with his children.  The following exchange occurred:

> WOODWARD: And if I say that, then what do I get?  Five, ten years in the state penitentiary for something that I felt that I shouldn't deserve?
>
> GUPTON: I don't want you to do anything – I'm serious.  I don't care if you spend a day in prison, Larry.  I don't.
>
> WOODWARD: It ain't what you care, it's what the state attorney wants.
>
> GUPTON: I give strong input in that.  A lot of that depends on what you're going to say.

Id. at 61-62.  Detective Gupton told Woodward that neither of his daughters wanted to see him go to jail – rather, all they wanted "is a relationship with their father back.  But right now, Larry, that can't happen until you come to grips with what has happened and work to make amends towards it." Id. at 67.  Detective Gupton told Woodward that he would be arrested but "what the State Attorney's Office does with it depends a lot on yourself as well" and "the only person that has the most control over their destiny right now is you." Id. at 72.

In Bram v. United States, 168 U.S. 532 (1897), the Supreme Court observed that "a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied

promises, however slight." Id. at 542 (internal quotations omitted). In Brady v. United States, 397 U.S. 742 (1970), the Supreme Court explained that Bram suggested that "even a mild promise of leniency," though not "an illegal act as such," undermines the voluntariness of a confession "because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess." Id. at 754. Bram's suggestion of a *per se* rule that renders a confession involuntary if preceded by "any direct or implied promises, however slight," was subsequently rejected by the Supreme Court. See Arizona v. Fulminante, 499 U.S. 279, 284–84 (1991)(recognizing that Bram "does not state the standard for determining the voluntariness of a confession."). Instead, as previously noted, the issue of voluntariness must be determined by examining the totality of the circumstances. Id. at 284–86.

Although Detective Gupton may have been given some indication of leniency, the record does not establish that Detective Gupton made an express promise of leniency to Woodward if he confessed. Moreover, Detective Gupton did not tell Woodward he could escape prosecution by confessing, or that he could successfully avail himself of a voluntary intoxication defense. See United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("Police misrepresentations of law . . . are much more likely to render a suspect's confession involuntary [than are misrepresentations of

fact].”). “While innuendo might rise to the level of trickery, it is not so likely to break down resistance as is a promise that is spelled out.” Miller v. Fenton, 796 F.2d 598, 609 (3d Cir. 1986). While troubling, this Court cannot conclude that Detective Gupton’s implied promises, standing alone, induced Woodward’s confession.

### 3.   Harmless Error

It is unnecessary to determine whether Detective Gupton’s implied promises, coupled with Woodward’s allegedly fragile physical condition, were such that Woodward’s confession was the product of unconstitutional coercion. Where an involuntary confession is improperly admitted at trial, a reviewing court must apply a harmless error analysis, assessing the error “in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Fulminante, 499 U.S. at 308. In the context of habeas review, the standard is whether the error had substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). The analysis must be conducted with an awareness that “a confession is like no other evidence,” and that “a full confession may have a profound impact on the jury.” Fulminante, 499 U.S. at 296 (internal quotations omitted). Here, a review of the trial transcript compels a conclusion that

Woodward's confession did not have a "substantial and injurious effect" on the jury's verdict. <u>Brecht</u>, 507 U.S. at 637.

In an effort to minimize the impact of the confession, defense counsel Thomas Bell ("Counsel" or "Bell") reviewed and critiqued Woodward's entire interview with Detective Gupton at trial. Bell criticized the detective's interviewing techniques and pointed out the detective's implied promises that Woodward would be treated more leniently if he confessed (T. at 388-536). Woodward testified that he felt pressured to confess and feared he would never be allowed to leave the police station if he did not do so. <u>Id.</u> at 587.

Dr. Meissner, an expert witness on false confessions, testified that Detective Gupton used interviewing techniques associated with an increased likelihood of false confessions (T. at 651, 557). The jurors were instructed by the trial court that the confession should be viewed with caution and disregarded if found to be coerced:

> Now a statement that is reported or claimed to have been made by the defendant outside of court, of course I am talking about the interview, has been placed before you. Those sorts of statements should always be considered with caution and be weighed with great weight or great care to make certain that those statements were freely and voluntarily made.
>
> Therefore, if you, the jury, first – I am sorry. Therefore, you the jury must determine from the evidence if the alleged statement was

> knowingly, voluntarily and freely made. Now in making this determination you should certainly consider the totality of the circumstances including but certainly not limited to whether when the defendant made the statement he had been threatened in order to get him to make the statement and whether or not anyone had promised him anything in order to get him to make the statement.
>
> Now if you conclude that the out-of-court statement was not freely and voluntarily made then of course you should disregard it.

Id. at 786-87.   Notably, jurors are presumed to follow jury instructions. Weeks v. Angelone, 528 U.S. 225, 226 (2000). Thus, Woodward's jury is assumed to have carefully weighed his confession and determined, based on the totality of the circumstances, whether he made the statements knowingly and voluntarily.

Moreover, in addition to Woodward's confession to Detective Gupton, the state presented other evidence of Woodward's guilt at trial.   Woodward's stepdaughter, H.B., testified that Woodward began molesting her when she was six or seven years old (T. at 206).   When she was seven or eight years old, Woodward made H.B. perform oral sex on him, and several days later, he performed oral sex on her. Id. at 207-08.   When she was eight or nine, Woodward tried to put his penis inside H.B.'s vagina while her mother held her down. Id. at 209.

Similar fact evidence was introduced through the testimony of Woodward's daughter, T.W., and niece, C.F. T.W. testified that Woodward began molesting her when she was three or four years old,

performed oral sex on her when she was five years old, forced her to touch his penis, and digitally penetrated her when she was ten years old (T. at 287, 291, 293, 294-95).  T.W.'s parents divorced after her mother learned of the abuse. Id. at 287. Additionally, Woodward's brother-in-law, James Forman, testified that Woodward confessed to fondling T.W.[5] Id. at 364.  T.W.'s mother testified that Woodward admitted sexually abusing T.W., telling her that he "would rather teach [T.W.] about sex than have somebody else" do so. Id. at 678.  C.F. also testified at trial, stating that when she was a child, Woodward fondled her, and stuck her in a closet when somebody came into the house. Id. at 550.  She testified that Woodward put his fingers in her (C.F.'s) vagina when she was spending the night with T.W. and licked her vagina when she was seven or eight years old. Id. at 552-53.

Given the evidence of Woodward's guilt and Bell's minimization of Woodward's statements to Detective Gupton, the Court concludes that the admission of the confession was harmless beyond a reasonable doubt. Fulminante, 499 U.S. at 308.  As such, even if the state courts' decisions were not entitled to deference, Woodward is not entitled to habeas relief on Claim One.

---

[5] Woodward admitted at trial to speaking with Forman, but claimed that the reference to sexual abuse pertained to his former wife and her brother (T. at 586).

### B.   CLAIM TWO

As Claim Two, Woodward asserts that the State failed to prove he did not invoke his right to counsel during his recorded interview with Detective Gupton (Petition at 22).[6]  Specifically, he argues that because portions of the recording are inaudible, it must be presumed "that he either invoked his right to counsel or his right to remain silent." Id.  Woodward does not argue that he actually invoked his right to remain silent or that he was not read his Miranda[7] rights at the beginning of the interview. Rather, he asserts that he did not completely understand his right to counsel and that the state did not prove his waiver was valid (Petition at 22).  Petitioner raised this claim on direct appeal (Ex. T at 40-41), but the claim was denied without a written opinion (Ex. Y). Upon review of the record and the applicable authority, the Court concludes that the state court's adjudication

---

[6] The words written in the title of Claim Two (which appear to set forth a Sixth Amendment Confrontation Clause claim) do not match the accompanying argument (Petition at 22).  However, Woodward also indicates in his Petition that he raised Claim Two as Issue II on his direct appeal. Id.  Issue II on appeal is the same claim discussed in the instant petition.  Accordingly, the Court will address the claim raised on direct appeal.  To the extent Woodward seeks to raise a separate Confrontation Clause claim, the claim appears to be unexhausted, and will not be further addressed by the Court.

[7] Miranda v. Arizona, 384 U.S. 436 (1966)(statements made by a defendant in police custody in response to interrogation are admissible at trial only if the defendant was informed of his right to consult with an attorney and of the right against self-incrimination).

of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In accordance with the Supreme Court's decision in Johnson v. Zerbst, 304 U.S. 458, 464 (1938), a valid waiver is defined as the intentional relinquishment or abandonment of a known right. Prior to the interview, Woodward was advised:

> You have the following rights under the United States Constitution.
>
> You do not have to make a statement or say anything.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before you make a statement, before any questions are asked of you, and to have a lawyer with you during any questioning.
>
> If you cannot afford to hire a lawyer, one will be appointed to you before any questioning, if you wish.
>
> If you do answer the questions, you have the right to stop answering the questions at any time and at any time consult with a lawyer.

(Int. at 3); (T. at 389).  Woodward affirmed that he understood these rights and acknowledged such on the written waiver. Id. Woodward's acknowledgment of understanding his rights supports a conclusion that he knowingly and voluntarily spoke with Detective Gupton. Frazier v. Cupp, 394 U.S. 731, 739 (1969) ("Before petitioner made any incriminating statements, he received partial

warnings of his constitutional rights; this is, of course, a circumstance quite relevant to a finding of voluntariness.").

At trial, Woodward explained why he told Detective Gupton that he understood his rights. He stated, "I think I understood but, you know, I have heard about the rights all my life and still never really understood what it meant, how they operated." (T. at 580). He further explained that he understood his right to remain silent, but did not understand he could stop at any point and ask for an attorney because, although he read the statement explaining this right, "during the course of the interview it was all gone. It slipped [his] mind." Id. at 609-10. Despite his statement that he forgot the warnings during his interview, Woodward did not request that Detective Gupton clarify or repeat the warnings. Nothing in the record, or Petitioner's background[8] would have alerted Detective Gupton to a need to renew the warnings. Woodward's self-serving statement that he initially understood his Miranda warnings, but forgot them during the course of the interview is not credible. Indeed, in light of this background, he provides no explanation for a sudden inability to retain an understanding of his rights.

---

[8] Woodward was forty-nine years old at the time of the interview with Detective Gupton, could read and write, and had held several jobs over the course of his life, including a three-year stint in a supervisory position for Venus Swimwear. Id. at 573, 608-09.

Moreover, neither Woodward's statement that, "I can't afford no lawyer so I guess I'll just hang out (inaudible)" or his reaction to Detective Gupton's statement that the State would appoint a "fly-by-night" public defender if Woodward proceeded to trial were unambiguous requests for counsel.[9]  At trial, Woodward responded to a question from Bell about how Woodward interpreted Detective Gupton's disparagement of public defenders, by

_____

[9] The "fly-by-night" statement is referenced in both the Petition and in the transcript of the hearing on the motion to suppress (Ex. K).  However, it was inadvertently omitted from the transcript of the interview attached to the motion to suppress. However, the judge read the omitted portion to the jury at trial (T. at 451-52).  Detective Gupton told Woodward:

> I have done enough reading, enough classes, enough practical cases of people that have sat right across from me, sat in your same seat right now.  Over a period of years, Larry, over a lifetime there is something that you can't control that would cause you – help you to act out that way and I think alcohol is a conduit that would stoke the fire, okay, and I could go to the State Attorney's Office and say this is what happened to Larry to help cause this, to help cause his actions or I simply – or I am simply going to go to the State Attorney's Office and say Larry says he was drunk and if he can't remember something maybe – it may be whether it happened or not he can't remember and the state attorney is going to say, okay, and they are going to assign you one of these – a fly by night public defender and that's going to be the end of Larry Woodward.

Id. Woodward responded, "either way, it's the end of Larry Woodward." Id. at 452.

explaining, "I have always heard the public defenders they weren't really that great and everything and if you got problems, you got troubles and everything if you are going to get cleared you are going to have money to buy a lawyer." (T. at 583-84). It appears Woodward did not want a public defender because he believed they were not as competent as other lawyers.  Woodward's subjective belief about the quality of public defenders, even if articulated to Detective Gupton, would have been insufficient to require the detective to stop the interview. See Davis v. United States, 512 U.S. 452, 459 (1994) ("[T]he suspect must unambiguously request counsel. . . [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."); McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for [whether a suspect has invoked his right to counsel]")(emphasis in original).

On this record, Woodward has failed to make a showing that the waiver of his Miranda rights was involuntary, or that he made an unequivocal request for counsel during the course of the interview.  Accordingly, Woodward is not entitled to federal habeas relief on Claim Two.

## C.   CLAIM THREE

In Claim Three, Woodward asserts that the trial court erred by allowing the state's Williams Rule[10] evidence of his alleged

---

[10] The Williams Rule is based on <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959) (evidence of collateral crimes is admissible at a jury trial when it is not introduced to prove the bad character or criminal propensity of the defendant, but is used to show motive, intent, knowledge, *modus operandi*, or lack of mistake).

The rule is codified at Florida Statute § 90.404(2)(a):

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

<u>Id.</u>  Florida's "prior bad acts" rule for child molestation cases is found at Florida Statute § 90.404(2)(b):

> 1.   In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

> 2.   For purposes of this paragraph, the term "child molestation" means conduct proscribed by s. 794.011 or s. 800.04 when committed against a person 16 years of age or younger.

<u>Id.</u>  Accordingly, for child molestation cases in the state of Florida, prior bad act evidence "is admissible, and may be considered for its bearing on any matter to which it is relevant." <u>Id.</u>

sexual activity with T.W. and C.F. to become an impermissible feature of his trial (Petition at 23).  With regard to this issue, on direct appeal, Woodward argued that: (1) the state presented the testimony of James Forman during the state's case in chief for the sole purpose of corroborating T.W.'s accusations; (2) the state was permitted, over objection, to present testimony from Woodward's ex-wife that he told her he would rather teach T.W. about sex than have somebody else do it; (3) the prosecutor placed undue emphasis on the collateral crime evidence in closing argument; and (4) Detective Gupton's interrogation of Woodward made it appear as if he had gotten away with something, and encouraged the jury to punish him for the collateral offenses (Ex. T at 41-45).

To the extent Claim Three can be construed liberally to raise a federal constitutional challenge to the admission of evidence regarding Woodward's alleged molestation of T.W. and C.F., the claim is unexhausted because Woodward did not present the federal constitutional nature of this claim to the state appellate court on direct appeal.  When briefing this claim, Woodward did not state, or even suggest, that it was a federal claim about due process or any other federal constitutional guarantee.  Rather, he argued, in terms of state law only, contending that "undue prejudice will be found when the collateral crimes evidence has been allowed to become a 'feature of the trial' in respect to both

the quantum of evidence presented and the arguments of counsel." Id. at 42 (citing Turtle v. State, 600 So. 2d 1214, 1218 (Fla. 1st DCA 1992)). Woodward further argued that the State "was not legally permitted to impeach [Woodward's] testimony that T.W. had never before accused him of sexual abuse with extrinsic evidence to the contrary.  The state was bound to accept [Woodward's] testimony as conclusive." (Ex. T at 43).  Woodward cited exclusively to state decisional law to support his arguments. Id. (citing Ruiz v. State, 743 So. 2d 1 (Fla. 1999); Caruso v. State, 645 So. 2d 389 (Fla. 1994); Smith v. State, 754 So. 2d 54 (Fla. 3d DCA 2000); Arrington v. State, 700 So. 2d 777 (Fla. 2d DCA 1997); Gonzalez v. State, 538 So. 2d 1343 (Fla. 4th DCA 1989)).

Woodward's failure to exhaust the federal basis of his claim renders it both unexhausted and procedurally defaulted because he is barred by state procedural rules from returning to state court to exhaust the federal constitutional nature of this claim. Woodward has shown neither cause excusing the default nor actual prejudice resulting from the bar. Moreover, he has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception. The default bars federal habeas review of Claim Three. See Duncan, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guarantee by the

Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

To the extent Woodward asserts that the trial court erred under Florida law by admitting evidence of his alleged molestation of T.W. and C.F., the claim is not cognizable on federal habeas review.  "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]" Alderman, 22 F.3d at 1555; see also Baxter v. Thomas, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections).  Therefore, it is not for this Court on federal review to decide whether the state trial court erred under Florida law by admitting evidence; rather, this Court may only consider whether the state trial court unreasonably applied clearly established federal law, "as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d).  Petitioner has not made this showing.

Even assuming *arguendo* that this claim is exhausted and raises a federal due process issue, Woodward is not entitled to habeas

corpus relief because he does not identify a Supreme Court case holding that the admission of similar fact or collateral crime evidence in similar circumstances is unconstitutional.  Therefore, Woodward cannot show that the appellate court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  See  Quintero  v.  McNeil,  No. 4:08cv318/RH/MD, 2009 WL 1833872 (N.D. Fla. June 23, 2009) (denying habeas relief on ground that there is no clearly established federal law as determined by the Supreme Court suggesting that the admission of evidence that a defendant committed sexual battery on another child violated due process); Lutz v. Palmer, No. 3:11cv334/LAC/EMT, 2012 WL 4660685, at *16 (N.D. Fla. Sep. 10, 2012) ("Petitioner has pointed to no Supreme Court precedent holding that the admission of relevant evidence, even evidence of a defendant's other bad acts, violates the Due Process Clause"); O'Leary v. Sec'y, Fla. Dep't of Corr., No. 2:12-cv-599-FtM-29CM, 2015 WL 1909732, at *7 (M.D. Fla. Apr. 27, 2015) ("Petitioner is not entitled to habeas relief because he has failed to identify a Supreme Court case holding that the admission of similar fact or collateral crime evidence in similar circumstances was unconstitutional.").[11]

---

[11] The Supreme Court has addressed whether prior acts evidence is permissible under the Federal Rules of Evidence, see Old Chief v. United States, 519 U.S. 172 (1997), Huddleston v. United States,

Upon consideration of the foregoing, the Court concludes that Claim Three is due to be dismissed as unexhausted and procedurally barred.  Moreover, Claim Three is denied on the merits pursuant to 28 U.S.C. § 2254(d).

### D.   CLAIM FOUR

Next, Woodward asserts that the trial court erred by refusing to allow him to present evidence that H.B. ran away from home after his arrest (Petition at 24).  He claims the evidence was relevant to corroborate his defense theory that his arrest gave H.B. an opportunity "to engage in behavior like running away, sleeping with her boyfriend and so forth." Id.  Woodward raises this claim under the Fourteenth and Sixth Amendments to the United States Constitution. Id.

Respondents urge that Claim Four is only partially exhausted because Woodward did not raise a Sixth Amendment claim at trial (Response at 36).  It is unnecessary for this Court to determine whether Woodward properly exhausted a Sixth Amendment claim because Claim Four lacks merit whether examined under the Fourteenth or the Sixth Amendment. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the

---

485 U.S. 681 (1988).  However, these cases did not explicitly address admission of such evidence in constitutional terms.

merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Prior to trial, the state filed a motion in limine asking the trial court to exclude any evidence or reference to H.B.'s leaving home twice after Woodward's arrest (Ex. J).  The prosecutor argued that the evidence was irrelevant and "would only serve in some way to comment on the victim's character and it would be improper character evidence because it happened well after the incidents occurred, well after it was reported, and it has no bearing on her ability to tell the truth now." (T. at 141-42).  Bell counter-argued that by putting Woodward, who was an authority figure over H.B., in jail, he could no longer "control [H.B.'s] coming and going because he used to object and complain and exercise some authority over her going to sleep, when she is 15 years old, with her boyfriend[,] and [H.B.'s] grandmother has less control over her." Id. at 144, 146.

In support of his argument, Bell proffered the testimony of H.B.'s grandmother who told the court that H.B. ran away "no more than three times" since Woodward's arrest, but always came home voluntarily. Id. at 256-57.  She also testified that H.B. stayed at a girlfriend's house during her absences. Id. at 258.  After hearing the proffered testimony, the Court sustained the state's objection to the admission of evidence regarding H.B.'s absences from home after Woodward's arrest.  Woodward appealed the trial

court's decision, and Florida's First District Court of Appeal *per curiam* affirmed the denial (Ex. T; Ex. Y).

### 1.  *Fourteenth Amendment*

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. California v. Trombetta, 467 U.S. 479, 485 (1984).  This standard ensures that criminal defendants have the opportunity to present a complete defense. Id.  "To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)).

Woodward cannot demonstrate a due process violation because he was not prohibited from presenting evidence of his control over H.B.  H.B. testified that Woodward did not care if she skipped school and that her grandmother made the rules of the house.  She also testified that nothing changed in terms of her freedom after Woodward's arrest (T. at 213, 217, 222).  She admitted Woodward tried to tell her what to do "from time to time" and that he described her as an "out of control teen." Id. at 223.  She also testified that after Woodward left, her boyfriend moved in with her. Id. at 224.  H.B.'s grandmother testified that Woodward and H.B.'s mother sometimes disciplined H.B. Id. at 267.  Woodward testified that he had a stormy relationship with H.B. because she

was rebellious. Id. at 606-07.  He also testified that he was stricter than H.B.'s grandmother. Id. at 608. Woodward testified that he believed H.B. fabricated the allegations against him because he was too much of an authority figure. Id. at 613.

During closing argument, Bell argued that H.B. was not to be believed (T. at 753).  He suggested that H.B. and the collateral crime victims were disgruntled children seeking revenge because Woodward was a mean guy who drank too much. Id. at 748-50.  He argued that H.B., upon reaching adolescence, was tired of Woodward's authority and wanted him out of the house. Id. at 750-51.  Given that Woodward was able to present his theory of defense, even without testimony of H.B.'s absences from home after his arrest, he has not set forth a Fourteenth Amendment due process violation.   The state court's adjudication of Woodward's Fourteenth Amendment claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication of Woodward's Fourteenth Amendment claim based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### 2.   Sixth Amendment

A Sixth Amendment Confrontation Clause violation arises when a criminal defendant is unable to "expose to the jury the facts from which jurors . . . could appropriately draw inferences

relating to the reliability of the witness." Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).  The right of confrontation is subject to limitation by the trial court "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant . . . [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Van Arsdall, 475 U.S. at 678 (emphasis in original).

If a Sixth Amendment Confrontation Clause violation has occurred, reversal is mandated on collateral review when the error "had substantial and injurious effect or influence in determining the jury's verdict." O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (quotation marks and citation omitted); Brecht, 507 U.S. at 623. The analysis of whether such a violation has occurred requires consideration of several factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684.

Evidence, whether elicited through the testimony of H.B.'s grandmother or through the cross examination of H.B., that months after Woodward's arrest, H.B. left the house without permission to stay with a girlfriend, was only marginally relevant to Woodward's theory of defense that H.B. sought his removal from the house because he was an authority figure.  Moreover, Bell was allowed to otherwise extensively cross examine H.B. regarding Woodward's alleged authority and control over her. Id. at 222-24.  The trial court's limitation of Bell's cross-examination did not violate the Confrontation Clause. Van Arsdall, 475 U.S. at 678.  Moreover, Bell presented testimony that H.B. quit school and that her boyfriend moved into her grandmother's house after Woodward was arrested.  If a Confrontation Clause violation occurred, it did not have "substantial and injurious effect or influence in determining the jury's verdict." O'Neal, 513 U.S. at 436.  As such, Woodward has not demonstrated that a Sixth Amendment Confrontation Clause violation entitles him to habeas corpus relief.

### E.   CLAIM FIVE

As to Claim Five, Woodward asserts that the trial court erred by failing to exclude testimony from collateral crime witness T.W. that she was a church-goer and that the people at her church encouraged her to forgive him for his alleged molestation (Petition at 25).  Specifically, Woodward argues that the trial court should

not have overruled Bell's objection to T.W.'s explanation of why she reconciled with her father.   T.W. testified at trial that she was encouraged to forgive Woodward for the sexual abuse:

> Well, through the next couple years after that, you know, everybody was – kind of kept encouraging me.   They are like this is your dad, you know.   He drank back then.   You need to forgive him, and everybody just wanted me to kind of let it go and drop it because it had been in the past, and when I turned 18 and I had my son at that time I was going to church and I was just trying to get my life together.
>
> . . .
>
> I was trying to get my life together, you know, because I had a family and I just wanted to, you know, start all over with my own family and, you know, the pastor and people at the church were like you need to forgive—

(T. at 302-03).   Bell objected to the testimony, but the trial Court overruled the objection.   Id.   Woodward now asserts that T.W.'s testimony violated Florida Statue Section 90.611 (evidence of the beliefs or opinions of a witness on matters of religion is inadmissible to show the witness's credibility is impaired or enhanced thereby) and Rule 610 of the Federal Rules of Evidence (evidence of a witness's religious beliefs or opinions is inadmissible for the purpose of attacking or supporting the witness's credibility), and in so doing violated the Sixth and Fourteenth Amendments (Petition at 25-26).

Respondents urge that this claim is unexhausted (Response at 38).   Indeed, Woodward raised this claim in his brief on direct

appeal, but framed his argument in terms of state law only – making

no reference to the United States Constitution, federal law, or

even federal cases.[12]   Therefore, Respondents are correct that

Woodward did not exhaust this claim.

For a habeas petitioner to fairly present a federal claim to

state courts:

> It is not sufficient merely that the federal
> habeas petitioner has been through the state
> courts . . . nor is it sufficient that all the
> facts necessary to support the claim were
> before the state courts or that a somewhat
> similar state-law claim was made. Rather, in
> order to ensure that state courts have the
> first opportunity to hear all claims, federal
> courts "have required a state prisoner to
> present the state courts with the same claim
> he urges upon the federal courts." While we do
> not require a verbatim restatement of the
> claims brought in state court, we do require
> that a petitioner presented his claims to the
> state court "such that a reasonable reader
> would understand each claim's particular legal
> basis and specific factual foundation.

McNair v. Campbell, 416 F.3d 1291, 1302–03 (11th Cir. 2005)

(emphasis added) (internal citations omitted). As part of such a

showing, the claim presented to the state courts "must include

reference to a specific federal constitutional guarantee, as well

as a statement of the facts that entitle the petitioner to relief."

Reedman v. Thomas, 305 F. App'x 544, 545–46 (11th Cir. 2008)

---

[12] Notably, although titled as a constitutional violation, the argument supporting the instant claim is also presented solely in terms of state and federal evidentiary law.

(internal citation omitted).  Because he did not refer to any "specific federal constitutional guarantee" in his brief on direct appeal, Petitioner's federal due process challenge to the admission of T.W.'s statement was not fairly presented to the state court and is unexhausted.  Petitioner does not satisfy (or even allege) the cause and prejudice, or fundamental miscarriage of justice exceptions to overcome the procedural default of this claim.  Florida's procedural rules and time limitations preclude a second direct appeal. Fla. R. App. P. 9.140(b)(3) (defendant wishing to appeal a final judgment must do so within "30 days following rendition of a written order").  Consequently, Petitioner's claim cannot be considered by this Court and is due to be dismissed.

Even had Petitioner properly exhausted this claim, it is without merit on federal habeas review. See 28 U.S.C. § 2254(b)(2). It is well-settled that alleged trial court errors in the application of state procedure or evidentiary law, particularly regarding the admissibility of evidence, are generally not cognizable as grounds for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Generally, a state court evidentiary ruling cannot rise to the level of a federal due process violation "unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (quoting Patterson v. New York, 432 U.S. 197, 202–03 (1977)).  Petitioner has presented nothing in the way of a Supreme Court case or other federal law to convince this Court that the admission of T.W.'s statement at trial constituted fundamental error.

Finally, even if constitutional error is found in a habeas proceeding, it is still subject to a harmless error analysis. Brecht, 507 U.S. at 637.  Had the state trial omitted the objectionable portion of T.W.'s testimony, Woodward has failed to persuasively show that the jury would not have reached a different verdict.  T.W.'s religion was not admitted to bolster her credibility, but to explain why she initiated contact with her father years after he allegedly molested her.  Woodward fails to demonstrate, in light of the entire trial record, a harmful error under Brecht. See discussion supra Claim One. Consequently, even if Claim Five were exhausted, it warrants no federal habeas relief.

### F.   CLAIM SIX

Next, Woodward argues that the trial court erred by sentencing him without the benefit of a presentence investigation report (Petition at 27).  He asserts that this failure violated both the

Florida and Federal Rules of Criminal Procedure as well as the Sixth and Fourteenth Amendments to the United States Constitution. Id.

Woodward raised a similar claim on direct appeal in which he argued that a presentence investigation report is mandatory under Rule 3.710 of the Florida Rules of Criminal Procedure when a defendant has been convicted of his first felony offense (Ex. T at 48). Woodward's appellate brief did not reference the United States Constitution or any other clearly established federal law. Id. Respondents urge that this claim is unexhausted because in his brief on direct appeal, Woodward raised it in terms of state law only (Response at 41). The Court agrees that Woodward's failure to refer to any specific federal constitutional guarantee in his brief on direct appeal renders this claim unexhausted. Additionally, Woodward does not satisfy the cause and prejudice, or fundamental miscarriage of justice exceptions to overcome the procedural default of this claim. Consequently, Claim Six cannot be considered by this Court and is due to be dismissed. See also discussion supra Claim Five.

Even if this claim were exhausted, to the extent a report was required, it was required only as a matter of state law. Congress did not enact 28 U.S.C. § 2254 to enforce state-created rights. Cabberiza v. Moore, 217 F.3d 1329, 1333 (11th Cir. 2000). Woodward has not set forth any "clearly established law as determined by

the Supreme Court of the United States" establishing a state criminal defendant's right to a presentence investigation report. In addition to being unexhausted, Claim Six fails to set forth a cognizable habeas corpus claim.

### G.   CLAIM SEVEN

As Claim Seven, Woodward asserts that the trial court erred under Blakely v. Washington,[13] by calling the jury's attention to the fact that the interrogatory pertaining to his age on the verdict form had not been checked (Petition at 29).   In the jury instructions, the trial court explained that if the jury found Woodward guilty of the alleged conduct, it would next need to determine whether he was 18 years or older at the time the crime was committed (T. at 795-96).   The court explained that "if you have factually found that to be the case then the [jury foreman] would mark that line in.   You don't have to but that is, you know, the next step in the process." Id. at 796.

After the jury returned with a verdict (but prior to the verdict's announcement), the trial judge reviewed the verdict forms and called counsel to a sidebar conference (T. at 813).   The

---

[13] Blakely v. Washington, 542 U.S. 296 (2004) (in the context of mandatory sentencing guidelines under state law, the Sixth Amendment right to a jury trial prohibits judges from enhancing criminal sentences based on facts other than those decided by the jury or admitted by the defendant).

judge noted that each of the interrogatories on Woodward's age was left blank. Id.  The following exchange occurred:

> COURT:     Members of the jury, specifically Ms. Valentino [the jury foreman], I've looked at the forms, and I want to make sure that I didn't mislead you about the instructions.  I've noticed that the age matter was not marked on any of the forms, was that because you decided not to do that, or because you misunderstood my instructions about it?
>
> FOREMAN:   I think we must have misunderstood.
>
> COURT:     Okay.  What I was talking about was only one on the margin.
>
> FOREMAN:   We probably need to go back in there.
>
> COURT:     Okay.   If you wouldn't mind stepping back.  Just talk about it, make sure – I mean, it may well be that that was what your decision was.  But I just want to make sure that that was the correct outcome.

(T. at 813-14).  When the jury returned, the judge asked whether "the consensus was that [his] instructions weren't very clear?" Id. at 14.  The jury foreman affirmed. Id.

Woodward now claims that under Florida law, "the jury's misapprehension of misunderstanding of the court's instructions is a matter which inheres in the verdict." (Ex. T at 49) (citing Marshall v. State, 854 So. 2d 1235, 1240 (Fla. 2003); Marks v. State Road Department, 69 So. 2d 771 (Fla. 1954); Wright v. Illinois & Mississippi Telegraph Co., 20 Iowa 195, 210 (1866)). He

argues that his sentence is illegal because the jury failed to make a finding of his age, and therefore he was not subject to a mandatory life sentence (Ex. T at 50). Woodward raised this claim in his brief on appeal, and Florida's First District Court of Appeal rejected it (Ex. T; Ex. Y).

Despite Woodward's assertion otherwise, the jury, not the judge, made the determination that he was over the age of eighteen when the crimes occurred. Woodward cites no clearly established federal law establishing that a trial court may not have a jury clarify a verdict. To the contrary, federal courts that have addressed the issue have determined "in any case upon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt[.]" United States v. Morris, 612 F.2d 483, 489 (10th Cir. 1979); United States v. Rastelli, 870 F.2d 822, 835 (2d Cir. 1989) ("[A] district judge has authority to require re-deliberation in cases in which there is uncertainty, contingency, or ambiguity regarding the jury's verdict."); United States v. Gaton, 98 F. App'x 61, at *2 (2d Cir. 2004) (unpublished) ("The jury's responses on the verdict form were clearly ambiguous. Having not yet discharged the jury, the District Court had the authority to require re-deliberation, and we certainly find no error in its doing so."); see also Griffin v. State, 414 So.2d 1025, 1029 (Fla. 1982) ("If it appears that a

mistake or oversight needs to be corrected, the court may send the jury back for further deliberations") (citation omitted).

Woodward presents nothing to show how the state court's adjudication of this claim was contrary to, or an unreasonable determination of, Blakely or any other clearly established federal law. Moreover, that Woodward was over the age of eighteen when the alleged crimes occurred was not disputed at trial. Accordingly, he is not entitled to federal habeas relief on Claim Seven. 28 U.S.C. § 2254(d).

### H.   CLAIM EIGHT

Woodward asserts that Bell was ineffective because he suffered under an inherently prejudicial conflict of interest (Petition at 31-32; Ex. EE at 12-15). Specifically, Woodward asserts that Bell told him that he (Bell) was a victim of childhood sexual abuse. Id. Woodward raised this claim as ground one in his Rule 3.850 motion, where he argued that "to be represented by a confessed 'child victim' encompasses a distinct element of inherent prejudice that both consciously and subconsciously cannot be deemed harmless without investigation by way of an evidentiary hearing." (Ex. EE at 13) (emphases in original).

The post-conviction court held an evidentiary hearing on Petitioner's Rule 3.850 motion (Ex. II). At the hearing, Bell denied that he was a victim of childhood sexual abuse or telling Woodward he was a victim of childhood sexual abuse. Id. at 8-9,

49.   Specifically finding Bell's testimony to be credible, the post-conviction court denied this claim (Ex. JJ at 96).   Woodward now argues that the post-conviction court abused its discretion when it credited Bell's testimony over his own without explaining the reasons for doing so (Petition at 32-33) (citing United States v. Camacho, 40 F.3d 349 (11th Cir. 1994); Gallego v. United States, 174 F.3d 1196 (11th Cir. 1999)).[14]

Respondents urge that Woodward failed to exhaust this claim because he expressly abandoned it in his collateral appeal after receiving an evidentiary hearing (Response at 55).   Respondents are correct.   While Woodward appealed the denial of his Rule 3.850 motion, he specifically noted that only grounds 2A, 3, 4, 5, 12, 14, 16, 17A, and 17B, none of which addressed the instant issue, were pertinent to the appeal (Ex. MM at 11).   The First District Court of Appeal affirmed as to all but two of Woodward's claims (Ex. QQ).

---

[14] It is unclear why Woodward cites Camacho; the opinion has little bearing on the facts at hand. In Gallego, the Eleventh Circuit determined that while a district court could legitimately find a defendant's testimony to be not credible, it cannot base a credibility determination solely upon the fact that a defendant's testimony is unsubstantiated. 174 F.3d at 1198-99. Gallego is an opinion from the Eleventh Circuit Court of Appeals, and is not "clearly established Federal law, as determined by the Supreme Court of the United" States. 28 U.S.C. § 2254(d).   Moreover, here, unlike Gallego, the state court specifically made a credibility determination.   And, finally, the Gallego court was not constrained by the deferential standards set forth in the AEDPA.

The "one complete round" exhaustion requirement set forth in O'Sullivan v. Boerckel, 526 U.S. 838 (1999) applies to post-conviction review as well as direct appeal; a prisoner must appeal the denial of post-conviction relief in order to properly exhaust state remedies. Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) ("Boerckel applies to the state collateral review process as well as the direct appeal process"); LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1261 (11th Cir. 2005) (as Florida prisoner failed to properly exhaust claim on direct appeal or Rule 3.850 appeal, it was procedurally barred, citing Coleman).

Pursuant to Rule 9.141(b)(3) of the Florida Rules of Appellate Procedure, the failure to fully brief and argue an issue on appeal after receiving an evidentiary hearing on a Rule 3.850 motion constitutes a waiver of that claim. See Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir. 1979) (Florida prisoner must appeal denial of Rule 3.850 relief to exhaust remedies);[15] Cortes v. Gladish, 216 F. App'x 897, 899-900 (11th Cir. 2007)(recognizing that when a petitioner receives an evidentiary hearing on his Rule 3.850 motion, his failure to address issues in his appellate brief constitutes a waiver of those claims); Coolen v. State, 696 So. 2d 738, 742 n.2 (Fla. 1997) (failure to fully brief and argue points on appeal constitutes a waiver of these claims). Woodward therefore failed to

---

[15] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

invoke one full round of the state's established appellate review process with regard to Claim Eight and cannot now return to state court and file an untimely collateral appeal challenging the denial of this claim. See Fla. R. Crim. P. 3.850(k).

In his reply, Woodward asserts that post-conviction appellate counsel, Bryan S. Gowdy, was ineffective for abandoning this claim in his appeal of the Rule 3.850 denial, and therefore, ineffective assistance of appellate counsel provides cause for the default (Reply at 4-7). In support, he cites Martinez v. Ryan, 132 S. Ct. 1309 (2012). Id. at 2. Martinez does recognize a narrow exception to the general rule that ineffective assistance of post-conviction counsel cannot constitute cause to overcome a procedural default. However, the Supreme Court expressly limited Martinez to attorney errors in *initial-review* collateral proceedings:

> The rule of Coleman governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, **including appeals from initial-review collateral proceedings**, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

Martinez, 132 S. Ct. at 1320 (internal citations omitted) (emphasis added); see also Lambrix v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1246, 1260 (11th Cir. 2014) ("Importantly, the Martinez rule is

expressly limited to attorney errors in initial-review collateral proceedings."). Accordingly, ineffective assistance of post-conviction appellate counsel does not provide cause for Woodward's failure to exhaust this claim. Woodward has not presented any other evidence to demonstrate cause or prejudice, much less the existence of the "fundamental miscarriage of justice" exception to the procedural bar. Accordingly, Claim Eight is due to be dismissed as unexhausted. See also discussion infra Claims Ten, Thirteen, and Fourteen (discussing credibility determinations on federal habeas corpus review).

## I.   CLAIM NINE

Woodward asserts that trial counsel, Bell, was ineffective for failing to properly "raise, argue and preserve for appellate review the inadmissibility" of his confession (Petition at 34). Specifically, Woodward argues that Bell should have challenged the voluntariness of his confession on the ground that he suffered a heart attack days prior to the interrogation and was under the influence of narcotic drugs during his police interview. Id.

Petitioner raised this issue in his Rule 3.850 motion, and the post-conviction court, noting that this ground was not considered at the evidentiary hearing, denied the claim as clearly negated by the record:

> The defendant's own attachments to his motion
> negate his claim. It is clear from the record
> in this cause that an extensive motion to

> suppress hearing was conducted at which all
> the issues regarding the defendant's mental
> stability and his medical condition and the
> medications which he consumed were thoroughly
> documented during the course of that hearing.
> Furthermore, the matter of the Court's denial
> of the motion to suppress was preserved for
> appellate review by way of the defendant's
> motion for new trial, which was submitted on
> appeal.

(Ex. JJ at 3-4).  Woodward appealed, and the appellate court

reversed on the ground that Woodward was entitled to an evidentiary

hearing on this claim (Ex. QQ); Woodward v. State, 992 So. 2d 391,

394 (Fla. 1st DCA 2008).

   After a second evidentiary hearing in front of a different

judge (Ex. RR), the post-conviction once again denied the claim,

finding it satisfied neither prong of Strickland:[16]

> Defendant also asserts that trial counsel was
> ineffective  by  not  further  investigating
> Defendant's mental state at the time he was
> questioned by police.  At the hearing, Mr.
> Bell explained his approach to Defendant's
> Motion to Suppress.  Mr. Bell testified that
> he hired an expert witness on the subject of
> false  confessions  to  testify  at  the
> suppression hearing. The expert, Dr. Christian
> Meissner,  focused  on  police  tactics  in
> obtaining false confessions.  However, he did
> understand  that  the  vulnerability  of  the
> person  being  questioned  was  an  important
> consideration, especially when combined with
> the police tactics.  Despite Dr. Meissner's
> knowledge  of  this  "other  side"  of  false
> confessions, he provided no recommendations to

---

[16] Woodward  asserts  that  the  post-conviction  court  found
Bell's performance to be deficient (Petition at 34-35).  This is
incorrect.   The  post-conviction  court  concluded  that  Woodward
failed to prove either Strickland prong (Ex. UU at 2-4).

Mr. Bell to investigate further for information or advice regarding Defendant's particular vulnerabilities.

While Mr. Bell's investigation may have been less than complete due to not seeking out, on his own, advice regarding Defendant's potential vulnerabilities during police questioning, his actions were still reasonable under the circumstances. As the U.S. Supreme Court in Strickland states: "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, at 690. Here, Mr. Bell's professional judgment was reasonable. Upon hiring Dr. Meissner, an expert on false confessions, one would reasonably expect the expert to provide clear indications that further investigation is warranted in order to fully explain the potential of a false confession for someone in Defendant's position. Nothing in the record demonstrates Dr. Meissner alerted trial counsel. How should we expect Mr. Bell to recognize a need to further investigate after consulting with an expert in the field of false confessions[?]

The second prong of Strickland requires Defendant to establish he was prejudiced by trial counsel's deficient performance. Id. at 687. In the instant case, even if trial counsel's performance rendered him ineffective, Defendant has not proven he has suffered any prejudice as a result of that representation.

Moreover, it was elicited through Dr. Meissner's questioning that Defendant, prior to being questioned by police, had shortly beforehand been hospitalized for a heart operation and at the time of the interview was taking Lorcet. The Court also learned Defendant had a history of alcohol abuse. Dr. Meissner acknowledged those factors could *potentially* lead one to confess falsely.

At Defendant's post-conviction hearing, Dr. DeClue, an expert in confessions as well, provided testimony indicating that the additional drugs Defendant was taking at the time of the questioning, as well as his history of drug and alcohol abuse should have been explored more fully by an expert and *could have* made Defendant more susceptible to giving a false confession. Dr. DeClue never met Defendant and never conducted any sort of an evaluation of Defendant. The expert witness admitted on cross-examination that he could not say whether an expert evaluation focusing on Defendant's vulnerabilities at the time of the interview would have helped or hurt Defendant. Moreover, it is possible the evaluation of Defendant would lead to the opinion he was not any more susceptible to confess falsely than an average person. Defendant presented nothing to dispel that possibility and "it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Consequently, as to the outcome of the Motion to Suppress hearing, Defendant has failed to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

If the Motion to Suppress had been granted (denying the State the use of Defendant's statements), Defendant has not established that there is a reasonable probability he would not have been convicted at trial. The trial record shows enough evidence with which to prove Defendant's guilt beyond a reasonable doubt. Specifically, the victim's testimony and the "Williams Rule" witness' testimony about Defendant's sexual abuse of both victims could have still been sufficient for the jury to render a "guilty" verdict. The granting of the Motion to Suppress would not have been dispositive.

(Ex. UU at 2-4) (internal citations to record omitted).  Florida's First District Court of Appeal affirmed the post-conviction court's determination of this claim without a written opinion (Ex. AAA).  Woodward does not explain how the post-conviction court's conclusion was contrary to, or an unreasonable application of, Strickland.  Instead, he merely disagrees with the state court's conclusions which are supported by the record.

At the evidentiary hearing, Bell testified that he believed Woodward's confession was coerced by the police and that the recording of the interview with Detective Gupton revealed that Woodward took narcotic pain medication on the day of the interview (Ex. RR at 33).  After speaking with two recognized experts on the subject of false confessions, Bell hired Dr. Meissner, an expert on coerced confessions, and told him about Woodward's drug use and heart condition. Id. at 27-29, 31, 56. Bell testified that his decision to focus on Detective Gupton's coercive interviewing style, instead of Woodward's personal vulnerabilities, was a tactical decision, not an oversight; therefore, he believed that an additional medical expert was unnecessary to develop the issue of Woodward's health or drug use. Id. at 38, 56-58.

Woodward presented the testimony of a different expert, Dr. DeClue, at the hearing who opined that it would have been helpful to the defense if Woodward had received a psychological examination on the same day, or shortly after, Detective Gupton's interview

(Ex. SS at 13).  Dr. DeClue believed that, while Dr. Meissner was qualified to "discuss and analyze the police techniques used during a specific interrogation," such would not be a thorough analysis of an interrogation without considering the particular vulnerabilities of the individual. Id. at 20.  Dr. DeClue believed that a clinical or counseling psychologist could have added to and supported Dr. Meissner's work. Id. at 27.

The test for ineffective assistance of counsel is not whether Bell *could* have done more; indeed, "perfection is not required." Waters v. Thomas, 46 F.3d 1506, 1518 (11th Cir. 1995).  Neither is the test what the *best* criminal defense attorney might have done.  Instead, the test is whether Bell performed within the wide range of reasonable professional assistance. Id.  In the instant case, Bell's decision to focus on Detective Gupton's coercive interview techniques through Dr. Meissner was not outside the wide range of reasonable professional assistance. Accordingly, Woodward cannot satisfy the narrow question of whether the state court unreasonably applied Strickland when it concluded that Bell's reliance on Dr. Meissner was reasonable. [17]

---

[17] The presumption that Bell's performance was reasonable is even stronger given his experience as a defense attorney at the time he took Woodward's case. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000); see Williams v. Head, 185 F.3d 1223, 1229 (11th Cir. 1999). Thomas Bell was admitted to the Florida Bar in 1986. See http://www.floridabar.org. Therefore,

Moreover, as discussed in Claim One, the admission of Woodward's statements to Detective Gupton was, at most, harmless error. See discussion supra Claim One.  Since the admission did not satisfy Brecht's harmless error standard, it cannot satisfy the more demanding Strickland prejudice standard. See, e.g., Pirtle v. Morgan, 313 F.3d 1160, 1173 n.8 (9th Cir. 2002) (Brecht harmless error analysis is lower standard than Strickland prejudice standard); Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007)("Strickland prejudice and Brecht harmless error are essentially the same standard."); Hall v. Vasbinder, 563 F.3d 222, 236 (6th Cir. 2009) ("The prejudice prong of the ineffective assistance analysis subsumes the Brecht harmless-error review."); Smith v. Dixon, 14 F.3d 956, 974, 976 (4th Cir. 1994) (en banc) (the prejudice inquiry under Strickland is essentially the same as the harmless-error inquiry under Brecht).

Woodward has satisfied neither prong of the Strickland ineffective assistance test, and he is not entitled to federal habeas corpus relief as to Claim Nine.

---

at the time of Woodward's trial in 2004, Bell was an experienced trial lawyer. See Ex. II at 18 (stating he had been practicing law for twenty years and had tried numerous felony cases including eight or nine first degree murder cases and three prior capital sexual battery cases).

### J.   CLAIMS TEN, THIRTEEN, AND FOURTEEN

Next, the Court will address Claims Ten, Thirteen, and Fourteen together.  In Claim Ten, Woodward asserts that Bell was ineffective for failing to move the trial court for funding to conduct further investigation (Petition at 38).  In Claim Thirteen, Woodward asserts that Bell was ineffective for failing to "properly investigate and advise the defendant [sic] answers regarding the real and maximum consequences of accepting the state's ten years offer on a guilty plea when conveying the state's offer to the defendant." Id. at 43.  In Claim Fourteen, Woodward asserts that Bell was ineffective for failing to properly prepare him to testify at trial. Id. at 45.

Woodward raised each of these claims in his Rule 3.850 motion (Ex. EE). After conducting an evidentiary hearing, the post-conviction court denied relief (Ex. II; Ex. JJ).  Woodward appealed the denials (Ex. MM).  Although he raised twenty-four separate claims in his Rule 3.850 motion, in his brief on appeal, Woodward specifically noted that only grounds 2A, 3, 4, 5, 12, 14, 16, 17A, and 17B were pertinent to his appeal (Ex. MM at 11).  As previously noted, the appellate court affirmed the post conviction decision as to all but two of Woodward's claims (Ex. QQ).

As in Claim Eight, Respondents urge that Claims Ten, Thirteen, and Fourteen are unexhausted because Woodward expressly abandoned them in his collateral appeal after receiving an evidentiary

hearing (Response at 75, 87, 90, 92). Woodward complains that he wanted to appeal all twenty-four of the claims raised in his Rule 3.850 motion, but post-conviction appellate counsel told him that "he was only going to file what he deemed was essential to get [Woodward] back to court for a New Hearing [sic]" and that he (collateral counsel) had not been paid enough to handle all issues raised in the Rule 3.850 motion (Reply at 5). As discussed, ineffective assistance of post-conviction appellate counsel does not provide cause for a petitioner's failure to fully exhaust his claims. See Martinez, 132 S. Ct. at 1320; Lambrix, 756 F.3d at 1250; discussion supra Claim Eight. Accordingly, Woodward has not shown cause or prejudice for his failure to exhaust Claims Ten, Thirteen, or Fourteen. Neither does he present new evidence of actual innocence to open a gateway to these defaulted claims. Accordingly, Claims Ten, Thirteen, and Fourteen are due to be dismissed as unexhausted. 28 U.S.C. § 2254.

Even if these claims were exhausted, Woodward is not entitled to federal habeas corpus relief because the post-conviction court's factual findings are entitled to AEDPA deference. 28 U.S.C. § 2254(b)(2). Claims Ten, Thirteen, and Fourteen (grounds three, six, and seven in Woodward's Rule 3.850 motion) are based on Woodward's dissatisfaction with the post-conviction court's determination that Bell's testimony at the first evidentiary hearing was more credible than Woodward's testimony (Petition at

39, 43, 46-47).   Indeed, in its written order denying Claims Ten and Thirteen, the post-conviction court specifically determined that "the testimony of trial counsel on this issue is credible." (Ex. JJ at 4, 5).   The court also determined that Woodward's allegations in Claim Fourteen were simply false. Id. at 6. Questions of the credibility and demeanor of a witness are questions of fact. Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999). The AEDPA affords a presumption of correctness to a factual determination made by a state court, and the habeas petitioner has the burden of overcoming the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e).

Determining the credibility of a witness, "is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (recognizing that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42 (2006) ("[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). As such, federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the

state trial court, but not by them." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434 (1983).

Woodward has not shown by clear and convincing evidence that the state court unreasonably found Bell's testimony to be more credible than his own.   Accordingly, he has not satisfied the first prong of <u>Strickland</u> on any of these claims. In addition to being unexhausted, Claims Ten, Thirteen, and Fourteen are due to be denied on the merits.

### K.   CLAIMS ELEVEN AND TWELVE

In Claim Eleven, Woodward asserts that Bell was ineffective for failing to "properly investigate [his] background that involved a documented mental health history, and the effects of drug and alcohol abuse as they contributed to [his] mental health conditions." (Petition at 39).   Woodward argues that Bell could have used the information learned from the investigation to offer an insanity defense at trial. <u>Id.</u> at 40.   In Claim Twelve, Woodward asserts that Bell was ineffective for "failing to develop and present a valid and substantiated defense strategy of the combined effects of [his] mental health disorders and a voluntary intoxication strategy[.]" <u>Id.</u> at 41.[18]

---

[18] Effective October 1, 1999, voluntary intoxication due to alcohol or drug use is no longer admissible to negate specific intent during the guilt phase of a trial. <u>See</u> § 775.051, Fla. Stat. (1999).   However, Woodward would not have been precluded from raising a voluntary intoxication defense at trial because the

Woodward raised these claims in his Rule 3.850 motion, and the post-conviction court denied them because Bell's decisions "were consistent with a plausible trial strategy and consistent with the defendant's manner of presentation at the time." (Ex. JJ at 4). The post-conviction court also concluded that Woodward and Bell had discussed the matter and "did agree to a defense to which [Woodward] actually testified at trial." Id. at 5. Woodward appealed the denial of this claim, and the appellate court remanded because Woodward should have been appointed collateral counsel to develop this issue at his evidentiary hearing. Woodward, 992 So. 2d at 393. Specifically, the appellate court concluded that without collateral counsel, Woodward was unable to produce the medical records or expert witnesses necessary to support his claim that he may have been insane when he molested H.B. Id.

Following remand, the state court appointed counsel to represent Woodward at his second evidentiary hearing (Ex. RR). After hearing testimony from Bell and expert witness Dr. DeClue, the post-conviction court denied the claim a second time:

> The Defendant also asserts that trial counsel was ineffective for not arguing Defendant was temporarily insane at the time of the offense(s) alleged. This is similar to State v. Williams, 797 So. 2d 1235 (Fla. 2001). In that case, the defendant alleged his counsel was ineffective for not pursuing the defense of voluntary intoxication. Id. at 1238-39.

offenses for which he was tried occurred prior to October 1, 1999. See Ex. G (Third Amended Information).

The Court concluded that the trial counsel in
Williams could not be deemed ineffective for
not pursuing a defense of [voluntary]
intoxication because it was inconsistent with
the defendant's theory of the case – that he
was innocent. Id. at 1239.

At the evidentiary hearing, Mr. Bell testified
he discussed with Defendant the trial strategy
and Defendant agreed to maintain his innocence
and allege that the victim was lying.
Accordingly, trial counsel in the instant case
cannot be deemed ineffective because of the
trial strategy, as discussed with and approved
by Defendant that is inconsistent with a
defense of voluntary intoxication.

(Ex. UU at 2-3). Florida's First District Court of Appeal affirmed

the denial of relief as to this claim (Ex. AAA). Woodward does

not suggest how the post-conviction court's denial of this claim

was contrary to, or an unreasonable application of, clearly

established federal law or based upon an unreasonable

determination of the facts. To the contrary, the record supports

the state court's factual finding that Bell considered and rejected

the possibility of a mental health defense in favor of the

reasonable defense theory that Woodward did not molest H.B.

At the second evidentiary hearing, Bell testified that he

considered all possible defenses, but concluded that insanity was

not a viable defense for Woodward (Ex. RR at 10). Bell stated

that Woodward told him prior to trial that the molestation may

have occurred with T.W., but insisted that he never molested H.B.

and that she was lying. Id. at 11, 22. Bell did not believe a

factual basis existed to pursue an insanity defense, and therefore, he and Woodward "settled on a defense strategy [that was] consistent with the facts." Id. at 22.  Woodward's defense theory at trial was that his confession was coerced, and that he never sexually molested or tried to rape H.B. (T. at 588, 593-94). Woodward testified at trial that H.B. lied about the sexual abuse because he was a disciplinarian and she wanted him out of the house. Id.

Given Bell's consideration and rejection of an insanity defense, and Woodward's insistence that he never molested H.B., it was certainly reasonable for Bell to forego pursuing an insanity or voluntary intoxication defense in favor of an actual innocence defense.  Therefore, Woodward has not demonstrated deficient performance under Strickland. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000) ("strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct"); White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) (defense counsel's failure to present voluntary intoxication as a defense in a capital-murder prosecution was not beyond the range of reasonable professional judgment and, thus, did not amount to ineffective assistance, in view of inconsistency of intoxication defense with deliberateness of the defendant's actions during the shootings); Cherry v. State,

781 So.2d 1040, 1050 (Fla. 2000) (recognizing that a voluntary intoxication defense is wholly inconsistent with the defense of innocence).

Moreover, to establish the affirmative defense of insanity under Florida law, a defendant must prove by clear and convincing evidence that at the time of the commission of the acts constituting the offense, he: (1) had a mental infirmity, disease, or defect; and (2) because of this condition he either did not know what he was doing or its consequences, or if he knew what he was doing and its consequences, he did not know that what he was doing was wrong. Fla. Stat. §§ 775.027(b)(1) and (2) (2003). Likewise, at the time Woodward committed the offenses, "voluntary intoxication [was] an affirmative defense and [] the defendant [was required to] come forward with evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged." Linehan v. State, 476 So.2d 1262, 1264 (Fla. 1985), *receded from on other grounds*, Coicou v. State, 39 So.3d 237 (Fla. 2010).

Even with the assistance of collateral counsel on this claim, Woodward presented no evidence at his evidentiary hearing that he was insane when he molested H.B.  Also, he does not allege that he was intoxicated when he sexually molested H.B. and that he could not, therefore, form the requisite intent to commit the charged acts.  Accordingly, Woodward cannot demonstrate Strickland

prejudice. See Kight v. Singletary, 50 F.3d 1539, 1546 (11th Cir. 1995) (failure to pursue insanity defense when defendant would not admit culpability in crime and failed to come forward with evidence to support claim of insanity, was not ineffective assistance of counsel); Presnell v. Zant, 959 F.2d 1524, 1533 (11th Cir. 1992) (rejecting habeas petitioner's ineffective assistance of counsel claim based upon counsel's failure to raise insanity defense because defendant failed to come forward with evidence supporting insanity defense).

In light of the foregoing, Woodward has failed to satisfy either prong of Strickland's ineffectiveness test.  Accordingly, Woodward is not entitled to federal habeas corpus relief. 28 U.S.C. § 2254(d).

## L.   CLAIM FIFTEEN

Woodward asserts that the post-conviction court erred when it denied grounds eight through eleven of his Rule 3.850 motion which collectively alleged that Bell was ineffective for allowing a prejudicial jury to be seated at his trial. Id. at 47-48. Specifically, Woodward argues that prior to voir dire, a newscast about a child victim of sexual abuse played in the jury room and the jury could have been tainted as a result. Id.  Woodward raised this issue in his Rule 3.850 motion, and the post-conviction court discussed Woodward's assertions before rejecting them on the ground that he could not demonstrate Strickland prejudice:

In each of these grounds, the defendant
suggests in assorted ways that trial counsel
was ineffective with regard to one issue in
the jury selection process in this cause.  The
author of the defendant's motion contends that
the jurors were exposed to prejudicial
newscasts in the jury waiting room prior to
their selection and that trial counsel did
nothing about it.  The defendant's motion does
not assert in any plausible manner how the
outcome of the defendant's trial would have
been different given what actually happened.
These grounds were not considered during the
evidentiary hearing.

The matter briefly arose during the course of
jury selection when the Court received an
email from an Assistant Public Defender
expressing her concern that Fox News article
had run that morning regarding a case of the
sexual abuse of a child.  A television in the
jury waiting area was turned to Fox News.  The
Assistant Public Defender happened to have
been a member of the jury pool, happened to
have been assigned to the undersigned's felony
division, and happened to know that the
defendant's case was set for trial that day.

When the Court received the information about
the newscast, a recess was taken and the
matter discussed with counsel.  The Court read
into the record the e-mail message sent by the
Assistant Public Defender in the jury pool.
The Court concluded that it would be
appropriate to question the potential jurors
on the issue and *voir dire* resumed.  Trial
counsel then proceeded to ask assorted
questions of the jurors, many of which
included their views of the media and their
media-viewing habits, but without
specifically alluding to the information
received by the Court about that morning's
newscast.  When trial counsel had concluded,
the Court specifically asked the jury members
whether or not they had seen the newscast and
if so, whether or not it would in any way
affect their ability to sit fairly and

impartially in the matter. While some indicated that they had seen the article, no one in the jury pool indicated that it would affect them in any way. Virtually nothing developed that indicated that the Court should take any further action whatsoever regarding the newscast.

In support of this claim, the defendant has attached assorted exhibits. None of them are part of the record in this cause. If they have any connection to the defendant's trial, it is an indirect connection at best. The exhibits are obviously the result of a web search conducted on the name of the victim apparently mentioned during the Fox News newscast. The resulting exhibit appears to be news reports of the trial in that case which happened more than a year **after** the defendant's trial. It is also noted that the transcript of the television program included in the defendant's exhibit involves and "Encore presentation" of an article apparently about the referenced child sexual abuse case. The "Encore presentation" occurred on August 4, 2002, at 21:00 E.T., that is 9:00P.M., well before the trial in this cause. It is a transcript of an interview conducted by commentator, Larry King, during the course of his program, *Larry King Live*. While the transcript might be factually interesting, it is of virtually no significance to the matter at hand. *Larry King Live* airs at 9:00 P.M. in Jacksonville and **not** during the course of a morning when jurors are awaiting movement to courtrooms. Furthermore, Larry King is employed by CNN and **not** by Fox News.

As to these grounds, the Court concludes that the defendant has failed to establish that trial counsel's performance was substandard.

(Ex. JJ at 6-8) (emphases in original, citations to trial transcript omitted).

Respondents urge that Claim Fifteen suffers from the same exhaustion defect as Claims Eight, Ten, Thirteen, and Fourteen because Woodward abandoned these issues in his appeal of the denial of his Rule 3.850 motion (Response at 92-93). Indeed, the grounds comprising Claim Fifteen were not among those post-conviction appellate counsel expressly decided to challenge on appeal of the denial of Woodward's Rule 3.850 motion (Ex. MM). As discussed, ineffective assistance of post-conviction appellate counsel cannot provide the cause and prejudice necessary to excuse a habeas petitioner's failure to exhaust his claims in state court, and Woodward has not presented new evidence of actual innocence to excuse the procedural default. Accordingly, Claim Fifteen is due to be dismissed as unexhausted. See discussion supra Claims Eight, Ten, Thirteen, and Fourteen.

Even had Woodward exhausted this claim, he does not show how the post-conviction court's denial of it was contrary to, or an unreasonable application of, clearly established federal law or based upon an unreasonable determination of the facts. To the contrary, the record and applicable law support the state post-conviction court's conclusions.

During voir dire, the trial court received a note that the jury room television aired a program regarding a young girl who had been sexually abused and murdered (T. at 105). The program interviewed the child's mother who discussed "what people should

look for in sexual predators." Id.  Bell asked the trial court to
inquire of the jury as to whether they had seen the program and
whether it would affect any juror's feelings about sitting on a
jury in a sex abuse case. Id. at 106-07.  The court inquired of
the prospective jurors whether they had seen the program. Id. at
117.  When some of the jurors indicated that they had seen the
program, the court asked whether they could "set aside anything
you may have seen in that show and rest your verdict in this case
solely and exclusively on the evidence which you hear or see during
the course of the trial?" Id. at 117-18.  The entire jury panel
indicated that they could so. Id. After the jury was selected, the
Court asked Woodward directly whether he was comfortable with the
jury, and he affirmed that he was. Id. at 128.

Woodward has failed to present evidence of Strickland
prejudice.  Because empaneled jurors are presumed impartial, Smith
v. Phillips, 455 U.S. 209, 215 (1982), to satisfy Strickland's
prejudice prong, Woodward must show that the jury selection process
produced a juror that was actually biased against him. Rogers v.
McMullen, 673 F.2d 1185, 1189 (11th Cir. 1982) (defendant's Sixth
Amendment right to a fair and impartial jury was not violated absent
a showing that a jury member hearing the case was actually biased
against him).  Woodward presents no evidence that any juror who
actually saw the news report, or was otherwise biased, was selected
to sit on the jury.  Rather, he merely speculates that "the trial

Court allowed a prejudicial jury to be seated[.]" (Petition at 48). Petitioner's unsupported and speculative assertions do not entitle him to habeas relief on this claim. See Hill v. Lockhart, 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

Petitioner fails to establish that the state post-conviction court either unreasonably applied Strickland or unreasonably determined the facts in rejecting this claim of ineffective assistance of counsel. In addition to being unexhausted, Claim Fifteen is due to be denied on the merits.

Any of Woodward's allegations not specifically addressed herein have been found to be without merit.

### IX. Certificate of Appealability Pursuant to 28 U.C.S. § 2253(c)(1)[19]

Woodward is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.

---

[19] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." As this Court has determined that Woodward is not entitled to habeas corpus relief, it must now consider whether he is entitled to a certificate of appealability.

28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability ("COA").  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Woodward must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller–El v. Cockrell, 537 U.S. 322, 335–36 (2003). Woodward has not made the requisite showing in these circumstances.

Because Woodward is not entitled to a certificate of appealability, he may not appeal *in forma pauperis.*

Therefore, it is now **ORDERED AND ADJUDGED:**

1. The Petition (Doc. 7) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.   The Clerk of Court is directed to enter judgment denying the Petition and dismissing this case with prejudice.

3.   If Woodward appeals the denial of the Petition, the Court denies a certificate of appealability.  Because the Court has determined that a certificate of appealability is not warranted, the **Clerk of Court** shall terminate from the pending motions report

any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

4.  The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE** and **ORDERED** in Jacksonville, Florida on March 28, 2016.


MARCIA MORALES HOWARD
United States District Judge


SA: OrlP-4
Copies to: Larry Wayne Woodward
Counsel of Record